HEARD NOVEMBER TERM, 1877.

## WALKER *vs.* RUSSELL.

The jurisdiction of the Probate Court "in cases of idiocy and lunacy and persons *non compos mentis* " is not exclusive, but concurrent with that of the Court of Common Pleas.

A person found lunatic by inquisition has legal capacity to bring an action to traverse the inquisition.

The Court of Probate has no jurisdiction in cases of lunacy to give relief to persons aggrieved by the inquisition by granting leave to traverse the same. Such jurisdiction is in the Court of Common Pleas.

BEFORE COOKE, J., AT PICKENS, AUGUST, 1877.

These were two actions, one by John S. Walker against W. Walker Russell and the other by Eleanor J. Walker against same defendant.

The case is sufficiently stated in the opinion of the Court.

*Norton, Keith & Hollingsworth*, for appellants.

*Cothran & Child*, contra.

April 23, 1878. The opinion of the Court was delivered by

McIver, A. J. In the case first above stated the plaintiff alleges that on the 15th of March, 1877, the defendant filed, in the Court of Probate for Pickens County, a ·petition praying that a writ *de lunatico inquirendo* might be issued to inquire into the alleged lunacy of the plaintiff; that on the 29th of March, 1877, the inquisition found that the plaintiff was a lunatic, and that on the 23d of April, 1877, the defendant was appointed committee of the plaintiff. It is also alleged that, as soon as this was done, the defendant filed a petition in the Court of Probate praying that he might be allowed, as such committee, to mortgage the real estate of the plaintiff for the purpose of raising the sum of two thousand dollars, but for what purpose the plaintiff asserts his ignorance, alleging that he stands in no need of the money. The plaintiff then avers that the finding of the inquisition is altogether untrue, as he never was at any time a person of unsound mind, but had, and still has, intelligence sufficient for the government of himself and his affairs. Upon these allegations the plaintiff demands judgment, first, that he be permitted to traverse the said inquisition; second, that, in the meantime, the defendant be enjoined from borrowing money for or on the credit of the plaintiff and mortgaging plaintiff's lands for the same, and from interfering in any way with the property of the plaintiff.

The allegations and prayer of the complaint in the second case are the same in substance, except that there is no allegation as to borrowing money for this plaintiff and mortgaging her property to secure the same.

In each case the defendant files a demurrer upon the same grounds, viz.: First, that the Court has no jurisdiction of the subject of the action; second, that the plaintiff has not legal capacity to sue; third, that there is another action pending between the same parties for the same cause; fourth, that the complaint does not state facts sufficient to constitute a cause of action.

The defendant in each of the cases also gave notice of a motion to dissolve the injunction which had been granted upon the filing of the complaint.

The Circuit Judge dismissed the motions and overruled the demurrers, from which the defendant appeals. As these two cases involve the same questions, they will be considered together.

·The question of jurisdiction will first be considered. It must be admitted that the Constitution leaves this question in some uncertainty, as its terms are not as clear as they might be. There is no doubt, however, but that the Court of Common Pleas is a Court of general jurisdiction in civil cases, while the Court of Probate is one of limited and inferior jurisdiction. Hence, according to a well-established rule of law, those who undertake to deprive the former of jurisdiction in any given case and give it to the latter must be able to point out some particular provision of the Constitution which either expressly or by necessary implication gives jurisdiction of such case to the limited and inferior tribunal to the exclusion of the superior tribunal. There is no pretense that there is any clause in the Constitution which, in *express* terms, gives the Probate Court *exclusive* jurisdiction " in cases of idiocy and lunacy and persons *non compos mentis.*" Section 20 of Article IV does give that Court jurisdiction in such cases, but not *exclusive* jurisdiction. The argument, however, is, that though exclusive jurisdiction in such cases is not conferred in *express* terms by that Section, yet that it is by *necessary implication,* upon the principle announced by Butler, J., in the case of *Righton* vs. *Wood,* (Dud., 167,) viz.: " Where a new forum has been created for the trial of cases that belonged to another, it has a superseding and paramount jurisdiction and thereby deprives the old tribunal of all authority." Without stopping to show that this language is nothing but an *obiter dictum* of the Judge who delivered the opinion of the Court, as the case turned upon another point, viz., that the Act of 1740, under which the proceeding in question was had, had been repealed by the Act of 1821, it is sufficient to say that this principle cannot be applied to the question we are considering. Here the old forum was abolished altogether, and its *entire* jurisdiction has been, in express terms, conferred upon another tribunal—the Court of Common Pleas—by the very same instrument by which a *portion* of its jurisdiction was conferred on the Court of Probate.

The old forum, which unquestionably had jurisdiction of the matter in hand prior to the Constitution of 1868, was the Court of Equity; and by Section 16 of Article IV of that Constitution the Court of Common Pleas is invested with "jurisdiction in *all* matters of equity," while by Section 20 of the same Article the Court of Probate is invested with jurisdiction in *some* matters of equity,—amongst other things, in cases of idiocy and lunacy and persons

*non compos mentis.*" The necessary inference would seem to be that while the Court of general jurisdiction—the Court of Common Pleas—was to have unlimited jurisdiction of *all* matters which were formerly cognizable by the Court of Equity, which was then abolished, the Court of inferior and limited jurisdiction—the Court of Probate—was to have concurrent jurisdiction in *some* of those matters, to wit, those which were particularly specified in the Section (20) conferring such jurisdiction. Any other view would involve a palpable inconsistency between these two Sections of the Constitution, which must, of course, if possible, be avoided. It can be easily avoided by holding the jurisdictions to be concurrent as to those matters specified in Section 20, just as it was held in *Burge* vs. *Willis*, (5 S. C., 212,) that the Court of Common Pleas has concurrent jurisdiction under the Constitution in civil cases cognizable before Justices of the Peace, or as is said in *Rhodes* vs. *Railroad Company*, (6 S. C., 385,) "the General Assembly having established Courts of Trial Justices and vested them with jurisdiction in actions *ex delicto* where the damages claimed do not exceed one hundred dollars, they have to such extent concurrent jurisdiction in suits of that character with the Circuit Court." It is argued, however, that as the jurisdiction of the Court of Chancery over idiots and lunatics had its origin, not in the powers inherent in that Court, but was a personal trust in the Lord Chancellor, especially delegated to him under the sign manual of the King, it ought not properly to be classed among 'matters of equity.'" But it must be remembered that, whatever may have been the origin of this jurisdiction, it had long before the adoption of the present Constitution come to be regarded as much within the scope of the powers exercised by the Court of Equity as cases of fraud, accident or trust; and in construing the Constitution we are bound to assume that the terms therein used were intended to be applied to the then existing condition of things, and not to a condition of things existing centuries before; that the Constitution gave to the Court of Common Pleas jurisdiction of all such matters as were *then* cognizable in the Court of Equity.

Again, it may be mentioned that, notwithstanding the origin of this jurisdiction in England, even there, after the custody of the lunatic was granted to some one, the Chancellor acted, in other matters relating to lunatics, not by virtue of the special warrant under the King's sign manual, but by virtue of the general powers

of the Court of Chancery.—2 Story Eq., § 1364; Shelf. on Lunacy, *17. And in England the petition for a writ *de lunatico inquirendo* was addressed to the Lord Chancellor, not as such, but as the person acting under the special warrant of the crown, (2 Story Eq., § 1365; Shelf. on Lunacy, *655,) while here such petitions have always been addressed to the Chancellor as head of the Court of Equity.

It is very obvious that this branch of the jurisdiction of the Court of Equity, as established in this State, was as well recognized as any other. The language used in the Act of 1808 (5 Stat., 571,) shows that the Legislature, as far back as that time, so regarded it; for when by that Act concurrent jurisdiction in cases of lunacy and idiocy was conferred upon the Court of Common Pleas, this language is employed: "That the Judges of the Court of Common Pleas shall be, and they are hereby, declared, in all cases of idiocy and lunacy which may hereafter occur, to be vested with jurisdiction concurrent with that exercised in like cases *by the Judges of the Court of Equity*, and the Judges of the several Circuit Courts of this State be, and they are hereby declared to be, vested with the like power and authority which the Judges of the Court of Equity by law, *or by the style, usage and practice of the Court of Equity, now have and exercise*, either as to inquiring into the lunacy or idiocy of any lunatic or idiot or as to the appointment of guardians of the person or property of such lunatic or idiot, *according to the usage and practice* of the Court of Equity in like cases." Nor can any argument be drawn, as has been attempted, from the fact that this Act has been repealed by the General Statutes, Chapter CXLVII, page 810, for the jurisdiction having been, as we have seen, conferred upon the Court of Common Pleas by the Constitution of 1868, there was, of course, no longer any necessity for the Act, and hence it, like many other Acts which had become obsolete or unnecessary by reason of the great changes in the fundamental law, was repealed.

Again, it is argued that the words "unless otherwise provided by law," in the concluding line of Section 16 of Article IV of the · Constitution, may be used to qualify the grant of jurisdiction of all matters in equity. The whole Section reads as follows: "The Court of Common Pleas shall sit in each judicial district in this State at least twice in every year, at such stated times and places as may be appointed by law. It shall have jurisdiction in all matters of ·

equity, but the Courts heretofore established for that purpose shall continue as now organized until the first day of January, one thousand eight hundred and sixty-nine, for the disposition of causes now pending therein, unless otherwise provided by law." The bare inspection of this Section must satisfy every one that to give the concluding words the qualifying effect contended for would require a forced and unnatural construction of the sentence. There is no necessity so to strain the language of the Constitution, for the only effect of giving to the Section its natural and usual construction will be to invest these two Courts—the Court of Common Pleas and the Court of Probate—with concurrent jurisdiction of several matters specified in Section 20 of this Article of the Constitution. And if, as we have seen, the Constitution gives the Court of Common Pleas concurrent jurisdiction with the Trial Justice Court, or the Court of a Justice of the Peace, in certain cases, we see no reason why the language of the Constitution should be distorted from its usual and natural construction in order to avoid giving the Court of Common Pleas concurrent jurisdiction with the Court of Probate in certain other cases.

Next, it is argued that Section 17 of Article IV of the Constitution ordains "that the General Assembly shall provide by law for the preservation of the records of the Court of Equity, and, also, for the transfer to the Court of Common Pleas and Probate Courts, for final decision, of all causes that may remain undetermined;" and that, in pursuance of this provision, the Act of 1868 (14 Stat., 10,) was passed, in which it is enacted, in Section 18, that "all suits in equity      *      *      *      shall be transferred to the Courts of Common Pleas      *      *      *      *Provided*, That no cause shall be transferred to the dockets of the Courts, as aforesaid, not cognizable therein under the Constitution : *Provided, further*, That all causes depending, as aforesaid, and the property and records pertaining thereto, cognizable under the Constitution in the Courts of Probate, shall be transferred to said Courts," and this amounts to contemporaneous construction of the Constitution in favor of the view contended for by the appellant. We do not think it should be so regarded, for the Legislature at the very same session, when they passed "an Act to define the jurisdiction and regulate the practice of Probate Courts," (14 Stat., 76,) did not undertake to declare that those Courts should have *exclusive* jurisdiction of cases of the kind now under consideration, but used the same terms as those employed in the Constitution.

The first proviso to the Act above quoted must, therefore, be regarded as relating to cases covered by Section 34 of Article IV—suits for the enforcement of contracts for the purchase of slaves; and the second as nothing more than a repetition of the words used in Section 17 of Article IV, above quoted. Nor do we see the force of the argument that Section 17, Article IV, of the Constitution would be a nullity under the construction which we have adopted; for if the two Courts have, as we believe, concurrent jurisdiction of a certain class of cases, the language used in that Section would be appropriate. The Court of Equity being abolished, the cases pending therein must be transferred to some other tribunal; those of which the Court of Common Pleas were to have exclusive jurisdiction would, of course, be transferred to that Court, while those of which the two Courts were to have concurrent jurisdiction would be transferred to the one or the other Court, as the parties controlling the causes might elect, under such regulations as should be provided by the General Assembly for the purpose—just as now, when a party has a claim within the jurisdiction of a Trial Justice he may bring his action either in that Court or in the Court of Common Pleas, as he may elect.—*Burge* vs. *Willis, Rhodes* vs. *Railroad Company, supra.* The fact that Section 21 of the Act last cited (14 Stat., 78,) gives the Court of Common Pleas appellate jurisdiction of all matters originally within the jurisdiction of the Court of Probate is not inconsistent with the idea of these two Courts having concurrent jurisdiction of certain matters; for, as we have seen, the Court of Common Pleas does have concurrent jurisdiction of certain cases with a Trial Justice's Court, and yet it is also invested with appellate jurisdiction of the same cases.—Gen. Stat., 658; Code of Procedure, § 369. And if there is no inconsistency in the one case, neither is there any in the other.

If, then, the Court of Common Pleas has jurisdiction of the case, even though it be concurrent with the Court of Probate, there would seem to be no difficulty in disposing of the other questions raised by the appellant.

As to the objection that the plaintiff has no legal capacity to sue, we are unable to see upon what ground it can be sustained. If it is based upon the ground that the plaintiff, having been found to be a lunatic, cannot bring any action except by his committee or guardian *ad litem*, this would be assuming as established the very point which it is the object of this action to raise. The proceeding by

which the plaintiff was found to be a lunatic was an *ex parte* proceeding, and it is very clear that both in England and in this country the application for leave to traverse an inquisition is always made in the name of the alleged lunatic.—Shelf. on Lunacy, *663; in the matter of *Wendell,* 1 John. Ch., 600; *Medlock* vs. *Cogburn,* 7 Rich. Eq., 477.

So, too, we do not see any foundation for the objection that there is another action pending between the same parties for the same cause; for if by this reference is made to the proceedings in the Court of Probate by which the plaintiff was found to be a lunatic, that proceeding was not only not *between* the same parties, for the proceeding being *ex parte* there could be only one party, but that proceeding could scarcely be said to have been pending at the time this action was commenced. It seems to have been fully disposed of, and the Court in which it was instituted had no power and no means of taking any further action in regard to it.

Upon the return of the inquisition the only other steps which could have been taken would have been, first, to quash· it for some irregularity in the finding or because it appeared on the face of it to be insufficient and award a new commission, (*Ex parte Barnesley,* 3 Atk., 168; *Ex parte Cramner,* 2 Ves., 454); or, second, the alleged lunatic might have been personally inspected and examined by the Judge, and, if he was satisfied of the soundness of the party's mind, the proceeding might have been discharged or a new commission awarded, (*Ex parte Roberts,* 3 Atk., 6); or, third, any person aggrieved by the finding of the inquisition might have applied for leave to traverse the inquisition, which was not a matter of discretion but a matter of right.—*Ex parte Ferne,* 5 Ves., 832. It does not appear that either of the two first steps were taken, and as the last could not be taken in the Court of Probate, as we shall presently see, the proceeding in that Court was at an end, the whole power of that Court having been exhausted.

Although the statute of 2d and 3d Edward VI, Chap. VIII, giving the right of traverse, has never been expressly made of force in this State, yet the practice in this State has always followed that statute, which, as Harper, Ch., says, in *Medlock* vs. *Cogburn,* (*supra,*) was but in conformity with the principles of the common law; for as the inquisition was always regarded as an *ex parte* proceeding, "by the common law no one is concluded by proceedings to which he is not a party." Or, as is said by Dunkin, Ch., in

*Keyes* vs. *Norris*, 6 Rich. Eq., 390: "In reference to proceedings in lunacy, our Courts adopt the practice of Westminster Hall as it existed prior to 1721, so far as is consistent with our institutions."

In this view, the statute of 2d Edward VI, giving the right of traverse, has been held applicable, although not expressly declared to be of force in this State by any legislative enactment. By the statute of 2d and 3d Edward VI, Chap. VIII, "any person aggrieved by the inquest is authorized to traverse the finding of the jury, and this is done by an issue in the Court of King's Bench." And, after stating some points of the practice of England, he says that, according to our practice, "an issue at law seems the appropriate remedy."

Now, if, as is very clear from the authorities, any person aggrieved by the finding of the inquest has a right to traverse such finding and have such traverse tried by a jury of the country, and if the Court of Probate cannot furnish the means of affording such a trial, as it manifestly cannot, inasmuch as, being a Court of limited jurisdiction, it has no powers except such as are granted, and no such powers have been granted to it, then one of two things must be the result: either the party who is aggrieved by the finding of the inquest must, in violation of Section 14, Article I, of the Constitution, be deprived of the benefit of a trial by jury in a case involving his most cherished rights, for, as Chancellor Harper well says, "all the cases on the subject regard the proceedings in lunacy as affecting in the highest degree the rights and liabilities of the citizen, as they manifestly do," or he must have access to some tribunal where that mode of trial secured to him by the Constitution can be obtained.

Now, if, as we have seen, the Court of Common Pleas is invested by the Constitution with concurrent jurisdiction in cases of lunacy, there is no reason why that Court cannot entertain a case brought, as this is, for the purpose of effecting that object. In the case of *Keyes* vs. *Norris*, one John M. Keyes was found to be of unsound mind by an inquisition of lunacy in February, 1836. In 1838 he married, and in 1850 he died intestate, leaving issue of that marriage. Upon a bill filed by such issue, claiming to be his heirs-at-law, it was held that the finding of the inquest was not conclusive upon the issue of the marriage as to the mental incapacity of J. M. Keyes at the time the marriage took place; that they had a right to have the question of his capacity tried, and that an issue at law was the proper mode of trying it.

Dunkin, Ch., in delivering the opinion of the Court, uses this language:

"In the case before the Court the intestate was not concluded by the inquisition, but might at any time have traversed the same. Until a traverse had been tendered by the lunatic, the proceedings were altogether *ex parte.* * * * * If he was not concluded, it is difficult to perceive upon what principle those claiming under him could be in a worse situation. A traverse being now impracticable for the reason stated, they are left to the ordinary mode of presenting and establishing their rights, subject only to the burthen of rebutting any *prima facie* inference which may arise from the inquest of February, 1836."

So here we may say that the plaintiff was not concluded by the proceedings in the Court of Probate, to which he was not a party, and, a traverse in that Court being impracticable by reason of the want of power in that Court to call to its aid the services of a jury, the plaintiff is left to the ordinary mode of asserting his rights guaranteed to him by the Constitution by an action in the Court of Common Pleas—a Court of general jurisdiction.

The fourth ground of demurrer is sufficiently disposed of by the views hereinbefore presented.

The motions in both of these cases are refused.

*Willard*, C. J., and *Haskell*, A. J., concurred.